UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DIANNE MARIE ESCALANTE,

     Plaintiff,

v.                                              Case No: 6:15-cv-796-Orl-JSS

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## ORDER

     Plaintiff, Dianne Marie Escalante, seeks judicial review of the denial of her claim for a period of disability, disability insurance benefits, and supplemental security income.  As the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and employed proper legal standards, the decision is affirmed.

## BACKGROUND

### A.    Procedural Background

     Plaintiff filed an application for a period of disability, disability insurance benefits, and supplemental security income on July 25, 2011, alleging disability beginning June 29, 2011.  (Tr. 20, 218–229.)  The Commissioner denied Plaintiff's claims both initially (Tr. 89–109) and upon reconsideration.  (Tr. 111–138.)  Plaintiff then requested an administrative hearing.  (Tr. 167–168.)  Upon Plaintiff's request, on September 11, 2013, the ALJ held a hearing at which Plaintiff appeared and testified.  (Tr. 43–88.)  Following the hearing, on November 8, 2013, the ALJ issued an unfavorable decision finding Plaintiff not disabled and, accordingly, denied Plaintiff's claims for benefits.  (Tr. 17–42.)  Subsequently, Plaintiff requested review from the Appeals Council,

which the Appeals Council denied. (Tr. 7–12, 15–16.) Plaintiff then timely filed a complaint with this Court. (Dkt. 1.) The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

## B.      Factual Background

Plaintiff, who was born in 1972, claimed disability beginning on June 29, 2011. (Tr. 20, 220, 224.) Plaintiff has a high school education, plus two years of college education, during which she earned an associate's degree in architectural drafting and design. (Tr. 48.) The ALJ determined that Plaintiff could not perform her past relevant work as a drafter, waitress, telemarketer, or telemarketer supervisor. (Tr. 33.) Plaintiff alleged disability due to neoplastic impairments, diverticulitis, neurological impairments, cardiovascular impairment, vertigo, musculoskeletal impairments, mental impairment, and chronic pain. (Tr. 25.)

The ALJ summarized Plaintiff's treatment records spanning from June 29, 2011, Plaintiff's alleged onset of disability, through fall 2013. (Tr. 25–29.) On June 29, 2011, Plaintiff was admitted to the hospital due to dizziness and facial pain. (Tr. 25, 389.) A magnetic resonance imaging scan ("MRI") of Plaintiff's brain revealed a tumor in her left auditory canal. (Tr. 25, 446.) Upon Plaintiff's discharge, on July 5, 2011, the notes of Plaintiff's treating physician indicate that Plaintiff had left facial nerve paralysis, migraine headaches, anxiety, oral thrush, and anemia. (Tr. 25, 389.) It was recommended that Plaintiff schedule a follow-up appointment with a neurologist. (Tr. 391.)

On July 26, 2011, Plaintiff was examined for mental health treatment by Dr. Najib Kirmani. (Tr. 454–457.) At the examination, Plaintiff reported that she was sad, withdrawn, anxious, phobic, panicked, and had difficulty sleeping, including having nightmares. (Tr. 455.) Dr. Kirmani found that Plaintiff was neat, clean, cooperative, and "normoactive" (rather than "slowed"

- 2 -

or requiring a "wheelchair").  (Tr. 456.)  Further, Dr. Kirmani found Plaintiff's thought patterns and perceptions to be clear, coherent, and goal-oriented.  (*Id.*)  Dr. Kirmani diagnosed Plaintiff with depressive and anxiety disorders.  (Tr. 454.)

After her hospitalization, on October 13, 2011, Plaintiff was examined by neurologist Dr. Phillip St. Louis regarding her dull discomfort in her left retromastoid, weakness on the left side of her face, difficulty hearing in her left ear, and imbalance.  (Tr. 473, 477.)  Dr. St. Louis noted that her gait was slightly impaired and that she had a history of migraines.  (Tr. 473, 478.)  He diagnosed Plaintiff with a benign neoplasm (tumor) and cerebral artery occlusion without cerebral infarction and recommended that Plaintiff seek consultation regarding gamma knife surgery to remove the tumor.  (Tr. 479.)  About a week later, Plaintiff reported to Dr. St. Louis that she blacked out at work, was experiencing memory loss, and that her speech was slurring.  (Tr. 571–572.)  In October of 2011, Plaintiff was examined by Dr. Ahmadi Zaman, an internal medicine practitioner and Plaintiff's primary care physician.  (Tr. 506–507.)  Dr. Zaman assessed Plaintiff as having acoustic neuroma, status-post coronary vascular disease ("CVA'), high blood pressure, and vertigo.  (Tr. 507.)  Plaintiff had a follow-up examination with Dr. Zaman a couple of weeks later at which Plaintiff reported having "ministrokes," resulting in her admission to the emergency room.  (Tr. 505.)

In late November 2011, Plaintiff underwent gamma knife surgery and was discharged in "good condition."  (Tr. 573.)  After her surgery, in December 2011, Plaintiff was examined by Dr. Michael Montejo, who reported that Plaintiff stated that her headaches, dizziness, and tinnitus in her left ear have were severe.  (Tr. 492.)  On January 1, 2012, Plaintiff visited the emergency room with a headache, nausea, and dizziness.  (Tr. 534–535.)  In January 2012, Plaintiff reported to Dr. Zaman that she had dizziness and a cough.  (Tr. 501–502.)  In February 2012, Plaintiff visited Dr.

Zaman and reported that her antidepressants, steroids to treat her facial pain, and medication to treat her vertigo had improved her symptoms.  (Tr. 500.)

In March 2012, the Florida Department of Health referred Plaintiff to Dr. Kirmani to determine Plaintiff's eligibility for disability benefits.  (Tr. 514–516.)  Dr. Kirmani noted that Plaintiff was "appropriately dressed and groomed," cooperative, and had no abnormality in her gait or posture.  (Tr. 514.)  As far as her activities, Plaintiff reported to Dr. Kirmani that she can shop for groceries, prepare simple meals, and do some household chores.  (Tr. 514–515.)  Dr. Kirmani concluded that Plaintiff did "not manifest a psychotic reaction" and had no deterioration in personal habits or intellectual capabilities, but he diagnosed her with depressive disorder.  (Tr. 516.)

Also in March 2012, Plaintiff reported to Dr. Zaman that she had gastrointestinal bleeding and Dr. Zaman assessed diverticulitis, rectal bleeding, and Bell's palsy.  (Tr. 526–527, 549.)  She was hospitalized in April 2012 because of abdominal pain and rectal bleeding, as Dr. Zaman recorded in his treatment notes.  (Tr. 548.)  Dr. Zaman prescribed antibiotics and recommended an abdominal CAT scan.  (*Id.*)  In May 2012, Dr. Zaman treated Plaintiff, but sent her to the emergency room for fluids because she had abdominal pain and rectal bleeding.  (Tr. 546–547.)  In June 2012, in a follow-up examination by Dr. Zaman, Plaintiff indicated that she still experienced abdominal pain, but that one of her prescriptions was improving her symptoms.  (Tr. 545.)  Her medication for vertigo, however, was not helping her symptoms.  (*Id.*)  On July 30, 2012, Plaintiff had hemorrhoidal banding surgery for internal hemorrhoids, which was causing her rectal bleeding.  (Tr. 564.)  In July 2012, Dr. Zaman noted that Plaintiff reported that her abdominal discomfort had resolved due to her use of her prescription, although she continued to have migraines.  (Tr. 544.)

In follow up examinations with Dr. Kirmani, for the period from January to July 2012, Dr. Kirmani reported significant progress with Plaintiff's immobility, depression, and anxiety and determined that her current treatment, including medications, should be extended for six months. (Tr. 463.)

 In July and August of 2012, Plaintiff reported to Dr. St. Louis that her headaches, nausea, vertigo, and speech problems had worsened since her surgery.  (Tr. 577, 579–580.)  Dr. St. Louis's assessments in August 2012 were benign neoplasm and cerebral artery occlusion without cerebral infarction and he advised Plaintiff to follow up with a radiation oncologist and a neurologist for her migraines and vertigo.  (Tr. 580.)  Plaintiff was examined by Dr. Zaman in the late summer through early fall of 2012, during which Plaintiff reported that her medication for migraines was not alleviating her symptoms, she had pain her in legs, acid reflux, and had fallen due to her vertigo. (Tr. 583–588.)  An MRI performed in August 2012 showed "[n]o significant change" in her tumor. (Tr. 569–570.)

Plaintiff was examined by Dr. Lata Bansal, a neurology consultant, in November 2012 regarding her migraines, numbness and paralysis in her face, and hearing difficulties.  (Tr. 590.) Dr. Bansal determined that Plaintiff's migraines could be of a "vascular" or "rebound" nature and could be worsened by stress.  (Tr. 591.)  Dr. Bansal recommended a different course of medication to treat Plaintiff's migraines.  (Tr. 591–592.)  In April 2013, in a follow-up examination, Plaintiff reported that, having followed Dr. Bansal's prescription recommendation, she was "doing much better," was having one to two headaches per month, each lasting up to three days, but was having some difficulty with her speech.  (Tr. 593.)

Dr. Kirmani, in a follow-up examination for the period from September 2012 through March 2013, reported that Plaintiff's progress with her mood and anxiety disorders was moderate and that Plaintiff complained of experiencing vertigo.  (Tr. 636, 644.)

In notes from a February 2013 examination by Dr. Zaman, Dr. Zaman noted that Plaintiff's vertigo medication makes her drowsy and therefore she only takes it at nighttime, but that treatment for her nerve damage was improving her condition.  (Tr. 679.)  Plaintiff was admitted to the hospital in May 2013 for slurred speech.  (Tr. 596–597.)  A computerized tomography ("CT") scan was performed and it revealed no evidence of an acute stroke.  (*Id.*)  While admitted, Plaintiff tested positive for benzodiazepine and marijuana and left the hospital against medical advice.  (*Id.*)  In the spring and summer of 2013, Plaintiff reported experiencing back pain, dizziness, migraines, and vertigo.  (Tr. 674–677.)  Dr. Zaman, in April and June 2013 treatment notes, reported that Plaintiff complained of vertigo, which he noted is due to her "nerve palsy" and history of having a brain tumor.  (Tr. 675, 677.)  In August 2013, she complained of having six to seven migraines per month, each lasting three to four days.  (Tr. 700.)  In September 2013, Plaintiff reported falling and sprained her foot and ankle.  (Tr. 716–720.)

At the hearing before the ALJ, held in September 2013, Plaintiff testified that her height is five feet and two inches and her weight is about 185 pounds.  (Tr. 49.)  She testified that she worked as a telemarketer in June 2011 and returned to that position after being hospitalized, which was after her alleged disability onset date.  (Tr. 52, 56.)  She testified that she lost this job and has had difficulties with other telemarketing jobs because of her difficulty with her speech and meeting the positions' "production" requirements.  (Tr. 52–56, 79.)  At the time of the hearing, she worked as a political surveying telemarketer for about twenty hours per week, getting paid $7.67 per hour. (Tr. 60–61.)

Plaintiff testified that, since her gamma knife surgery, her migraines have worsened.  (Tr. 62–63.)  She testified that when Dr. Bansal changed her migraine medications, the change helped temporarily, but then they returned and she has migraines about three to four times a month, each lasting two to three days.  (Tr. 63–64.)  She also takes medication for her nausea and vertigo.  (Tr. 64.)  As to her internal hemorrhoid surgery, Plaintiff testified that it was "partially successful" and that the problem persists and her current treatment is not helping.  (Tr. 66.)  She testified that she lost most of her hearing in her left ear due to her gamma knife surgery.  (Tr. 67.)  She also has pain in her neck, back, and knees, which affects her ability to stand.  (*Id.*)

As to her daily activities, Plaintiff testified that she is able to sit for ten to twenty minutes and stand for five minutes, but requires support from a cane to balance due to her vertigo and lower back pain.  (Tr. 68–69.)  She requires assistance dressing and getting in and out of the shower, but does some household chores and cooking.  (Tr. 70–74.)  When she is not working, she sits on the couch with her feet up, but must shift positions due to her back pain.  (Tr. 75.)

Finally, as to her depression, Plaintiff testified that Dr. Kirmani treats her for depression, anxiety, and difficulty sleeping.  (Tr. 77–78.)  Dr. Kirmani, Plaintiff testified, is her treating psychiatrist, but also examined her as part of her disability application.  (Tr. 77.)  She testified that Ambien helps her sleep and that she has needed to increase her antidepressant.  (Tr. 78.)  She testified that her depression stems from her facial paralysis and weight gain.  (*Id.*)

## C.     The ALJ's Decision

In rendering the decision, the ALJ concluded that Plaintiff had not performed substantial gainful activity since June 29, 2011, the alleged disability onset date.  (Tr. 22.)  The ALJ considered Plaintiff's testimony that she has performed work after the alleged onset date and, at the time of

the hearing, was working as a political surveying telemarketer (Tr. 52–54, 59–60, 86), but concluded that the wages Plaintiff was earning did not constitute gainful activity.  (Tr. 22.)

Next, the ALJ determined that Plaintiff had the following severe impairments: CVA and an affective disorder.  (*Id.*)  The ALJ considered Plaintiff's impairments of left facial paralysis, migraine headaches, a history of a back disorder, and a history of osteoarthritis of the hands, but found them to be non-severe.  (*Id.*)  Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"), specifically Listing 12.04, which describes affective disorders.  (Tr. 22–24.)

The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform less than the full range of sedentary work.  (Tr. 24.)  Specifically, Plaintiff can ambulate with a cane, occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to extreme temperatures, hazards, machinery, and heights.  (*Id.*)  Plaintiff is able to understand, remember, and carry out simple instructions and perform simple, routine tasks.  (*Id.*)  In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not fully credible.  (Tr. 30–33.)

The ALJ determined that Plaintiff could not perform past relevant work as a drafter, waitress, telemarketer, or telemarketer supervisor and that Plaintiff's past work as a political survey worker was not gainful activity.  (Tr. 33, 84–85.)  In so finding, the ALJ relied on the vocational expert's ("VE") testimony.  (Tr. 33.)  At the hearing, the ALJ asked the VE whether an

individual who is Plaintiff's age and has Plaintiff's educational background and RFC would be able to perform Plaintiff's past relevant work.  (Tr. 33, 85–86.)  In response, the VE testified that such an individual would not be able to perform Plaintiff's past relevant work.  (Tr. 33, 86.)[1]

Next, the ALJ stated that Plaintiff was 38 years old, as of the alleged onset date, and had a high school education with an additional two years of college education.  (Tr. 33–34.)  Given Plaintiff's age, education, work experience, and RFC, the VE testified that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as a document preparer, food and beverage order clerk, and ticket counter.  (Tr. 34–35.)  Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled.  (Tr. 35, 36.)

## APPLICABLE STANDARDS

To be entitled to benefits, a claimant must be disabled, meaning that the claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, in order to regularize the adjudicative process, promulgated the detailed regulations currently in effect.  These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled.  20 C.F.R. § 416.920.  If an

---

[1] To be precise, the VE testified that such an individual could perform Plaintiff's work as a political survey worker, which Plaintiff was doing at the time of the hearing, but the ALJ determined that this work was not gainful activity due to the wages she earned.  (Tr. 22, 33, 86.)

individual is found disabled at any point in the sequential review, further inquiry is unnecessary. *Id.* at § 416.920(a).  Under this process, the ALJ must determine, in sequence, the following:  (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, i.e., one that significantly limits the ability to perform work-related functions; (3) whether the severe impairment meets or equals the medical criteria of a Listing; and, (4) whether the claimant can perform his or her past relevant work.  If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of the claimant's age, education, and work experience.  *Id.*  A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. § 416.920(g).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards.  *See* 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

In reviewing the Commissioner's decision, the court may not decide the facts anew, re-weigh the evidence, or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis,

mandates reversal.  *Keeton*, 21 F.3d at 1066.  The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## ANALYSIS

Plaintiff challenges the ALJ's decision on the following grounds: (1) the ALJ erred by finding Plaintiff's migraines non-severe and failing to determine whether Plaintiff's vertigo is severe; (2) the ALJ failed to state the weight he afforded opinions of three of Plaintiff's treating physicians and failed to sufficiently state his reasons for discrediting a fourth treating physician's opinions; and (3) the ALJ erred by relying on the testimony of the VE because the ALJ's hypothetical did not adequately reflect Plaintiff's limitations.  (Dkt. 24.)  For the reasons that follow, none of these contentions warrant reversal.

## A.      Step Two Severity of Impairments Analysis

The ALJ concluded that Plaintiff had the severe impairments of CVA and affective disorder, but that her impairments of left facial paralysis, migraines, history of back disorder, and history of osteoarthritis in her hands were non-severe.  (Tr. 22.)  Plaintiff contends that the ALJ erred by not addressing whether Plaintiff's vertigo is a severe impairment and determining that Plaintiff's migraines were non-severe because these impairments more than minimally affected her ability to perform work.  (Dkt. 24 at 11–15.)

At step two of the evaluation process, the ALJ must consider the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  When considering the severity of the claimant's medical impairments, the ALJ must determine whether the impairments, alone or in

combination, significantly limit the claimant's physical or mental ability to do basic work skills. *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004) (citing 20 C.F.R. § 404.1520(c)).

At the second step, the claimant bears the burden of proof that he or she suffers from a severe impairment or combination of impairments. *Gibbs v. Barnhart*, 156 F. App'x 243, 246 (11th Cir. 2005).  An impairment is not severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).   "Basic work activities" include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1)–(6).

If an ALJ finds that a claimant has a severe impairment, even if an ALJ errs in finding a claimant's *additional* impairments are non-severe, such error is harmless because the ALJ has determined that step two of the analysis is met and proceeds in the disability analysis.  *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010); *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) ("Accordingly, even assuming that [claimant] is correct that her additional impairments were 'severe,' the ALJ's recognition of that as a fact would not, in any way, have changed the step-two analysis, and she cannot demonstrate error below."); *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 902–03 (11th Cir. 2011) ("Even assuming the ALJ erred when he concluded [claimant's] edema, sleep apnea, and obesity were not

severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process.").

The ALJ is, however, "required to consider all impairments, regardless of severity, in conjunction with one another in performing the *latter steps* of the sequential evaluation." *Tuggerson-Brown*, 572 F. App'x at 951 (emphasis added). As examples, an ALJ's statements that he considered whether claimant's impairment or combination of impairments met a Listing or that he considered all symptoms in determining claimant's RFC are sufficient "to demonstrate that the ALJ considered all necessary evidence." *Id.* (finding the ALJ's discussion of the combined effects of claimant's impairments sufficient because the ALJ discussed the non-severe impairments in the ALJ's assessment of claimant's RFC); *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (emphasis in original) (quoting the ALJ and finding that it was "clear" that he ALJ considered claimant's impairments in combination because the ALJ stated that "'based upon a thorough consideration of all evidence, the ALJ concludes that appellant is not suffering from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity'"). The ALJ's failure to consider the combination of a claimant's impairments requires reversal. *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir. 1985).

In this case, at step two of the sequential evaluation process, the ALJ found that Plaintiff had severe impairments of CVA and affective disorder. (Tr. 22.) Thus, the ALJ found in Plaintiff's favor at step two and proceeded with the other steps of the sequential evaluation process to determine whether Plaintiff was disabled. Because the ALJ found that Plaintiff had severe impairments and thus proceeded beyond step two, any error in failing to find that Plaintiff suffers from *additional* severe impairments of migraines and vertigo was rendered harmless. *Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 892 (11th Cir. 2013).

Further, at step three of the sequential process, the ALJ properly considered all of Plaintiff's relevant impairments and found that Plaintiff did not have an "impairment or combination of impairments" that met or equaled a Listing, which is sufficient to show that the ALJ considered the combined effect of Plaintiff's impairments. (Tr. 22–23.) *Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011); *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). Also, the ALJ considered medical evidence relating to Plaintiff's migraines and vertigo when assessing Plaintiff's RFC at step four of the sequential process. (Tr. 24–30.) After considering Plaintiff's treatment history, including treatment for migraines and vertigo, the ALJ concluded that although Plaintiff's "medically determinable impairments" could reasonably cause Plaintiff's alleged symptoms, her testimony as to the symptoms' persistence, intensity, and limiting effects was not credible. (Tr. 30.) Specifically, the ALJ found that the record evidence showed that medication helped treat Plaintiff's vertigo and migraines. (Tr. 30–31, 590, 593.) Thus, the ALJ concluded as follows:

> While it is reasonable to conclude that the claimant should have some pain and/or limitations as a result of the effects of migraines and pain through the body, the evidence as a whole does not substantiate any cause for such debilitating pain, as described by the claimant, which would preclude all work activity. The record fails to show that the claimant has required significant forms of treatment such as additional surgery, nor does the record show such a marked diminished range of motion or muscle atrophy as would accompany the alleged disability.

(Tr. 31.)

In sum, the ALJ sufficiently considered whether the combination of Plaintiff's impairments rendered Plaintiff disabled because the ALJ considered all of Plaintiff's impairments, severe and non-severe, at steps three and four of his analysis. Further, because the ALJ found that Plaintiff has severe impairments, at step two of his analysis, the ALJ's determination that Plaintiff's migraines and vertigo are non-severe, even if erroneous, was harmless. Accordingly, Plaintiff's first contention does not warrant reversal.

**B.      Weight Accorded to Treating Physicians' Opinions**

Next, Plaintiff contends that the ALJ erred by failing to (1) state the weight he afforded to the opinions of Plaintiff's treating physicians Dr. St. Louis, Dr. Bansal, and Dr. Montejo, and (2) sufficiently articulate his reasons for affording treating physician Dr. Zaman's opinions little weight.  (Dkt. 24 at 17–19.)

**1.      Dr. St. Louis, Dr. Bansal, and Dr. Montejo**

Plaintiff argues that the ALJ's failure to state the weight he afforded the opinions of three of Plaintiff's treating physicians—Dr. St. Louis, Dr. Bansal, and Dr. Montejo—is reversible error. (*Id.* at 17.)   Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity" of the claimant's impairments, including the claimant's symptoms, diagnosis and prognosis, the claimant's ability to perform despite impairments, and the claimant's physical or mental restrictions.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178–79 (11th Cir. 2011) (internal quotation and citation omitted); 20 C.F.R. § 404.1527(a)(2).

A treating physician's opinion is "given substantial or considerable weight unless good cause is shown to the contrary" and an ALJ must specify the weight given to the treating physician's opinion. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  However, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his or her decision, so long as the decision is not "a broad rejection" that leaves the court with insufficient information to determine whether the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Thus, "[t]o the extent that the administrative law judge erred by failing to state with particularity the weight assigned to [treating physicians'] medical opinions, the error is harmless"

if it does not "affect the administrative law judge's ultimate determination." *Hunter v. Comm'r of Soc. Sec.*, 609 F. App'x 555, 558 (11th Cir. 2015) (finding that the ALJ's decision was supported by substantial evidence and, therefore, the ALJ's failure to explicitly state the weight afforded to treating physicians' testimony was harmless error); *Tillman v. Comm'r, Soc. Sec. Admin.*, 559 F. App'x 975, 975–76 (11th Cir. 2014) (recognizing harmless error analysis in the context of an ALJ's failure to address a treating source's opinion and concluding that "when the ALJ's error did not affect its ultimate findings, the error is harmless, and the ALJ's decision will stand"); *Caldwell v. Barnhart*, 261 F. App'x 188, 191 (11th Cir. 2008) (finding that the ALJ's failure to state the weight given to a physician's opinions was harmless error because the opinions did not otherwise contradict the ALJ's findings); *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005) (finding harmless error for the ALJ's failure to explicitly state what weight he afforded to a number of physicians' medical opinions when the opinions did not directly contradict the ALJ's findings).

First, as to Dr. Bansal, Plaintiff was treated by Dr. Bansal, a neurology consultant, beginning in November 2012 for Plaintiff's migraines. (Tr. 590–593.) As Dr. Bansal's November 2012 treatment notes show, Plaintiff sought treatment from Dr. Bansal after her gamma knife surgery because her migraines worsened. (Tr. 590.) Dr. Bansal noted that Plaintiff treated her migraines with Floricet and her nausea and vertigo with Phenergan and that "[s]tress may be contributing to her symptoms." (Tr. 590–591.) She recommended that Plaintiff take the prescription Topamax. (Tr. 592.) In April 2013, Plaintiff visited Dr. Bansal for a follow-up appointment, at which Dr. Bansal noted that although Plaintiff was still experiencing migraines and nausea, she was "doing much better," only having one to two headaches per month, and "noted a significant improvement" from using Topamax. (Tr. 593.) Dr. Bansal recommended that

Plaintiff increase her dosage of her medication and would prescribe her a separate prescription "as needed." (*Id.*)

The ALJ summarized Dr. Bansal's treatment records (Tr. 29) and explicitly considered them, although he did not mention Dr. Bansal by name, in making his credibility determination as to Plaintiff's pain testimony.   (Tr. 30–31.)   Specifically, the ALJ stated that he considered Plaintiff's treatments for her pain and symptoms and concluded that, although this treatment "would normally weigh somewhat in claimant's favor, the record also reveals that the treatment has generally been successful in controlling these symptoms." (Tr. 30.)  The ALJ cited a number of instances in the record in support of this statement, including Dr. Bansal's treatment records, when he discussed the improvement in Plaintiff's migraine symptoms based on treatment with Floricet and Topamax.  (Tr. 31.)  Thus, "although the administrative law judge did not specifically identify [Plaintiff's] treating physicians by name, the judge summarized [Dr. Bansal's] treatment notes" and relied on Dr. Bansal's treatment notes in reaching his credibility determination as to Plaintiff's pain testimony, indicating that he fully credited Dr. Bansal's opinions.  *Hunter*, 609 F. App'x at 558.

Furthermore, the ALJ's ultimate determination would not differ had he explicitly stated the weight he afforded Dr. Bansal's opinions because the ALJ's decision relies on Dr. Bansal's treatment notes to determine that Plaintiff's pain testimony was not credible because her medications offered her more relief than her testimony indicated. (Tr. 30–31.) The ALJ's decision shows that he considered and fully credited Dr. Bansal's opinions and any harm caused by the ALJ's failure to specify the weight he accorded Dr. Bansal's opinions was harmless.

Second, Dr. St. Louis, a neurologist, examined Plaintiff in October 2011, after she was hospitalized for facial numbness and dizziness.  (Tr. 473, 477.)  Dr. St. Louis examined Plaintiff,

performed an MRI, determined that Plaintiff had a tumor, and recommended that she undergo gamma knife surgery to remove the tumor. (Tr. 476, 479.) After her surgery, Plaintiff saw Dr. St. Louis regarding her hearing loss in her left ear and increased migraines. (Tr. 575–576, 579.) The ALJ summarized Dr. St. Louis's treatment records (Tr. 25–26) and relied on them in his determination that Plaintiff's pain testimony was not fully credible, stating that Dr. St. Louis's treatment notes did not reveal any findings to support Plaintiff's pain testimony. (Tr. 32–33.) Specifically, the ALJ considered Dr. St. Louis's August 2012 treatment notes in which Dr. St. Louis found that Plaintiff was "well developed," "well nourished," alert, oriented, and had a normal speech pattern, gait, reflexes, and range of motion. (Tr. 32–33, 579.) Further, Dr. St. Louis referred Plaintiff to Dr. Bansal for treatment of her migraines. (Tr. 580.) "Although the ALJ did not explicitly state what weight he afforded the opinions of [Dr. St. Louis] none of [his] opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless." *Wright*, 153 F. App'x at 684. Rather than contradict his findings, the ALJ relied on Dr. St. Louis's findings to support his credibility determination regarding Plaintiff's pain testimony. (Tr. 32–33.) Accordingly, the ALJ's failure to specify the weight he accorded Dr. St. Louis's opinions was harmless error because the ALJ's determination would not differ had the weight afforded been explicitly stated.

Finally, as to Dr. Montejo, a radiology specialist, Plaintiff was referred to Dr. Montejo by Dr. St. Louis for gamma knife surgery to remove her tumor. (Tr. 496.) In November 2011, Dr. Montejo reported that Plaintiff complained of facial weakness on the left side of her face and ringing in her left ear. (*Id.*) He noted her history of migraines and previous facial plastic surgery. (*Id.*) In his notes, he stated that her tumor was "likely the root" of Plaintiff's facial numbness and dizziness and he recommended surgery. (Tr. 497–498.) After Plaintiff's December 2011 gamma

knife surgery, Dr. Montejo examined Plaintiff, noting that her "chronic pain syndrome and headaches . . . are not clearly worse," although her hearing and vertigo may have worsened due to inflammation.  (Tr. 493.)  He prescribed her steroids to treat her inflammation and suggested that she consult her primary care physician regarding the propriety of taking multiple prescriptions to treat her migraines.  (*Id.*)

Although the ALJ did not specifically identify the weight he accorded Dr. Montejo's opinions, the ALJ's decision summarizes Dr. Montejo's medical reports.  (Tr. 27.)  Therefore, it is clear that the ALJ properly considered Dr. Montejo's findings and did not discount his opinion. In fact, the ALJ relied on the chronology of Plaintiff's impairments, as shown through her treatment records, including her visits to Dr. Montejo pre- and post-surgery, to support his determination that Plaintiff's pain testimony was not supported by the record.  (Tr. 30–31.)  Thus, the ALJ's failure to specify the weight afforded to Dr. Montejo's opinions was harmless because Dr. Montejo's opinions "do not [] contradict the ALJ's findings."  *Caldwell*, 261 F. App'x at 191.

### 2.    Dr. Zaman

The ALJ reviewed Dr. Zaman's "Physical Medical Source Statement," prepared on August 29, 2013.  (Tr. 670–673.)  The ALJ noted that Dr. Zaman determined that Plaintiff could sit and stand or walk for less than two hours in an eight-hour workday and would be unable to walk for any distance.  (Tr. 32, 671–672.)  He found that Plaintiff would need to take four to five unscheduled breaks per day for ten to fifteen minutes per break, could not sit for long periods of time, and could never twist, stoop, bend, crouch, squat, or climb stairs or ladders.  (Tr. 671–672.) Further, although the ALJ found that Plaintiff would have "significant limitations" with reaching or handling objects, he found that she could frequently grasp, turn, and twist objects.  (Tr. 672.)

The ALJ afforded Dr. Zaman's medical source statement "little weight" because it appeared that he took her subjective complaints of pain as true, but, as the ALJ determined, Plaintiff's pain testimony was discredited by the medical evidence.  (Tr. 32.)  Further, the ALJ found that Dr. Zaman's source statement and underlying treatment records "fail to reveal the type of significant or clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled, and [Dr. Zaman] did not specifically address this weakness." (*Id.*)  Plaintiff argues that, contrary to the ALJ's conclusion, there *is* medical evidence showing that Plaintiff's pain is as she alleges and, therefore, Dr. Zaman's reliance on her reports of pain was proper.  (Dkt. 24 at 18–19.)

A medical source statement is "a standardized questionnaire used to ascertain a physician's opinion on the claimant's physical or mental limitations."  *Markuske v. Comm'r of Soc. Sec.*, 572 F. App'x 762, 765, n.2 (11th Cir. 2014).  Medical source statements are considered by an ALJ when evaluating disability and evaluate what a claimant "can still do despite" the claimant's impairments, based on the claimant's medical history, clinical findings, laboratory findings, diagnoses, treatment, response to treatment, and prognosis.  20 C.F.R. § 404.1513(b)(6).

A physician's statements in a medical source statement regarding "issues reserved to the Commissioner" are not medical opinions, which are entitled to controlling weight under 20 C.F.R. § 404.1527(a)(2) and (c), "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." *Id.* at § 404.1527(d)(1); *Miles v. Comm'r Soc. Sec.*, 469 F. App'x 743, 745 (11th Cir. 2012) ("[A] medical source's statement that a claimant is 'unable to work' or 'disabled' does not bind the ALJ, who alone makes the ultimate determination as to disability under the regulations.").  Thus, although an ALJ considers a physician's statements about a claimant's RFC, for example, the ALJ does "not give any special significance" to the fact

that a statement is from a claimant's treating physician and "the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2)–(3); *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 834 (11th Cir. 2011) ("A doctor's opinion on dispositive issues reserved to the Commissioner, such as whether the claimant is disabled or unable to work, is excluded from the definition of a medical opinion and is not given special weight, even if it is offered by a treating source, but the ALJ should still consider the opinion.").

As to the portions of the physician's opinion that do not involve issues reserved to the Commissioner, a treating physician's opinions are "given substantial or considerable weight unless good cause is shown to the contrary." *MacGregor*, 786 F.2d at 1053. An ALJ's failure "to clearly articulate the reasons for giving less weight to the opinion of a treating physician" is reversible error. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for giving a treating physician's opinion less weight "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240-41; *see* 20 C.F.R. § 404.1527(c)(2) (stating that more weight is given to a claimant's a treating physician if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.").

Here, as to the portions of Dr. Zaman's medical source statement that made conclusions reserved to the Commissioner, e.g. that Plaintiff's symptoms and limitations were consistent with her impairments (Tr. 673), these portions are not medical opinions. 20 C.F.R. § 404.1527(a)(2). As such, although the ALJ was required to consider these portions, he was not required to afford them significant weight because they were not medical opinions that are afforded such weight. *Id.* at § 404.1527(d). However, as to the portions of Dr. Zaman's medical source statement entitled

to controlling weight, contrary to Plaintiff's assertion, the Court finds that the ALJ adequately explained his reasons for giving Dr. Zaman's opinion less weight. The ALJ found that Dr. Zaman's own treatment notes did not reveal the sort of condition that would cause the physical limitations Dr. Zaman reported in his medical source statement and that there was record evidence discrediting Plaintiff's allegations as to the severity, intensity, and persistence of her symptoms. (Tr. 32.)

Specifically, although Dr. Zaman's 2013 treatment records for Plaintiff indicated that she was having pain in her back and shoulders, vertigo, migraines, sinus infections, upper respiratory infections, and hemorrhoids, Dr. Zaman advised her to continue with her pain medications, noted that her sinus infections and upper respiratory infections were treated with antibiotics, and referred her to specialists as needed. (Tr. 674–682.) Further, the evidence shows that she had a surgery related to her hemorrhoids and that medication helped resolve her abdominal discomfort. (Tr. 544, 564.) Dr. Bansal's records show that her recommendations as to prescriptions for Plaintiff's migraines helped Plaintiff (Tr. 593), although Plaintiff testified that the improvement did not endure. (Tr. 80, 593.) Also, the ALJ considered Plaintiff's testimony regarding her daily activities, finding that they are "not limited to the extent one would expect given the complaints of disabling symptoms and limitations" and show that Plaintiff worked after her alleged disability onset date, including at the time of the hearing. (Tr. 30.)

Thus, the ALJ's determination that Dr. Zaman's opinions should be accorded little weight because they was inconsistent with his treatment notes and other record evidence is supported by the record. *See Brown v. Comm'r of Soc. Sec.*, 442 F. App'x 507, 512 (11th Cir. 2011) (finding that "the ALJ had good cause not to give controlling weight" to a treating physician's opinions because they did not refer to his treatment records, did not "adequately explain his opinions," and

in fact conflicted with his treatment records); *Markuske*, 572 F. App'x at 765-66 (finding that the ALJ's discrediting a treating physician's medical source statement was supported by substantial evidence because the physician's treatment notes and other record evidence contradicted the medical source statement).   Finally, it should be noted that Dr. Zaman completed his medical source statement a couple of weeks prior to Plaintiff's hearing before the ALJ, at which time Plaintiff was working, although the ALJ determined that her employment was not gainful.   (Tr. 22, 52–54, 59–60, 86.)   *See Farnsworth v. Soc. Sec. Admin.*, 636 F. App'x 776, 781 (11th Cir. 2016) (affirming the ALJ's discounting treating physicians' assessments of claimant's limitations because "they were not supported by many treatment notes and were contradicted by the fact that [claimant] was actually working for the last eight months.").

Therefore, the ALJ sufficiently articulated "good cause" for giving Dr. Zaman's opinions little weight because the evidence supports the ALJ's reasoning that Dr. Zaman's treatment records and other record evidence contradicted his opinions in his medical source statement.   *Phillips*, 357 F.3d at 1240–41.   Also, Plaintiff's contention that there is record evidence to support Plaintiff's reports of pain—and, thus, Dr. Zaman could rely on Plaintiff's reports of pain in his medical source statement—is unavailing because the Court must consider whether the ALJ adequately articulated his reasons for discounting Dr. Zaman's opinions and must not re-weigh the evidence.   *Dyer*, 395 F.3d at 1212.   Because the ALJ articulated his reasons for discrediting Plaintiff's testimony, which were supported by substantial evidence, Plaintiff has not demonstrated reversible error.

## C.      The ALJ's Hypothetical to the VE

Finally, Plaintiff contends that, because the ALJ failed to weigh the opinions of Dr. St. Louis, Dr. Bansal, and Dr. Montejo and sufficiently explain his reasons for according Dr. Zaman's opinions little weight (*see supra* § B), the hypothetical posed to the VE did not adequately reflect

Plaintiff's limitations.  (Dkt. 24 at 20.)  Therefore, Plaintiff argues, the VE's testimony regarding jobs Plaintiff can perform that exist in the national economy should not have been relied upon by the ALJ to conclude that Plaintiff is not disabled.

When the ALJ determines that a claimant cannot perform past relevant work, then the Commissioner must produce evidence that claimant is able to do other jobs existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c).  The burden then shifts to the claimant to show that the claimant "is unable to perform the jobs that the Commissioner lists." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  "[T]he Commissioner's preferred method of demonstrating that the claimant can perform other jobs is through the testimony of a [vocational expert]." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  A vocational expert's testimony constitutes substantial evidence when the ALJ poses a hypothetical question to the vocational expert "which comprises all of the claimant's impairments." *Wilson*, 284 F.3d at 1227.

At the hearing, the ALJ asked the VE what jobs in the national economy could be performed by a hypothetical claimant with Plaintiff's age and educational and work history who has the RFC to perform "sedentary work," with the following additional limitations: needing an assistive device to ambulate; being able to climb, balance, stoop, kneel, crouch, and crawl only occasionally; never being able to climb ladders, ropes, or scaffolds; needing to avoid concentrated exposure to extreme heat, cold, hazards, machinery, and heights; and being able to understand, remember, and carry out simple instructions and simple, routine tasks.  (Tr. 85–86.)

Plaintiff argues that the hypothetical the ALJ posed to the VE did not incorporate all of Plaintiff's limitations, yet Plaintiff does not identify any such limitations that the ALJ allegedly failed to incorporate into his hypothetical.  (See Dkt. 24 at 19–20.)  *See Freeman v. Comm'r, Soc.*

*Sec. Admin.*, 593 F. App'x 911, 916 (11th Cir. 2014) (affirming the ALJ's decision because the hypotheticals posed by the ALJ were consistent with the RFC determination and adequately considered all of [claimant's] credible limitations).  As determined above, although the ALJ did not specify the weight he afforded to the opinions of treating physicians Dr. St. Louis, Dr. Bansal, and Dr. Montejo, he summarized their treatment notes and relied upon them in reaching his determination as to the credibility of Plaintiff's pain testimony, which demonstrates that he considered them in assessing his RFC.  *See supra* § B.  Finally, the ALJ's decision to accord Dr. Zaman's opinions little weight was sufficiently articulated and supported by substantial evidence and, therefore, "the ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported."  *Crawford v. Comm'r Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).  Therefore, Plaintiff's final contention does not warrant reversal because the ALJ's conclusion that Plaintiff had the RFC to perform jobs existing in significant numbers in the national economy was supported by substantial evidence, namely the vocational expert's testimony.

## CONCLUSION

Accordingly, after due consideration and for the foregoing reasons, it is

**ORDERED**:

1.      The decision of the Commissioner is **AFFIRMED**.

2.      The Clerk of Court is directed to enter final judgment in favor of the Commissioner and close the case.

**DONE** and **ORDERED** in Tampa, Florida on July 22, 2016.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record